CHARLES A. BORCHERS v. CHARLES B. SPANN and MARY R. SPANN.

Western Section. June 30, 1931.

Petition for Certiorari denied by Supreme Court, March 5, 1932.

Miles, Waring & Walker, of Memphis, and Smith, Remster, Hornbrook & Smith, of Indianapolis, Indiana, for appellant.

Ewing, King & King, Wilson, Kyser, Armstrong & Allen and Winchester & Bearman, all of Memphis, for appellee.

HEISKELL, J. In 1924, an agreement was entered into between complainant, C. A. Borchers, the defendants Spann and wife and J. H. Bulger, by which a lot in Miami, Florida, was purchased, the title taken in the name of defendants, but complainant and Bulger were each to pay one-fourth of the purchase money and to receive one-fourth each of the profits. Bulger is not a party to this suit. All testimony as to him was excluded and so it will not be necessary to notice him further. It was understood that defendants, the Spanns, were to purchase the property and to handle it. They were engaged in the real estate business in Indianapolis and had also dealt in real estate in Florida. All the parties lived in Indianapolis, Indiana.

In December, 1924, Spann wired Borchers to send $1300 which complainant did. This was to pay one-fourth of the cash payment on the lot which was encumbered to the amount of about $8,000. On August 13, 1925, the lot was sold by defendants to Herman Rhodes of Memphis for $60,000, $12,500 being paid in cash, the mortgage being assumed, and for the balance four notes due at one, two, three and four years, in equal amounts and aggregating $39,500. Rhodes and wife executed a mortgage on the lot to secure these notes. Spann after deducting certain expenses paid to complainant his share of the net cash amounting to $2250, and then executed and delivered to complainant his four promissory notes each for $2478.75, due August 13, 1926, August 13, 1927, August 13, 1928 and August 13, 1929. These notes to be paid and surrendered as Rhodes paid his notes. On April 8, 1926, Spann also paid to complainant $395, his proportion of the interest paid by Rhodes to Spann.

On or about November 15, 1926, Spann reported to complainant that Rhodes had refused to pay anything more on said lot and it was agreed that Spann and wife should bring suit against Rhodes in the Federal Court at Memphis, and on November 27, 1926, complainant paid Spann $200 as his part of the expense of said suit. The suit was brought and resulted in a judgment against Rhodes and in favor of the Spanns for the full amount claimed. Rhodes had set up as a defense that there was a shortage in the front feet of said lot and therefore a fraud had been perpetrated on him. He brought a separate suit in Florida on the same ground. Time was given in the Memphis case to make a survey in Florida and this showing no shortage, the defense of Rhodes was denied. The Florida case was never tried.

Down to this point there is practically no disagreement between the parties as to the facts, but from this time on there is controversy. Complainant testifies as follows:

"A. The next thing I heard of the trial, it was about July 8th or 9th, I could not say the date exactly, that Spann called up—phoned us to come over.

"Q. When you say 'us' who do you mean? A. For me and my wife. We went over—.

"Q. Yes. A. We went over there in the evening. Mrs. Spann seemed to be very much depressed and talked very discouragingly. Mr. Spann seemed to be a little bit nervous and kept pacing back and forth. They told us—the substance of the conversation—of course they had just returned from Memphis,—they had got judgment, but the judgment did not mean anything for the reason that Mr. Rhodes had taken the bankruptcy law, and he had brought counter-suit to set aside the judgment on account of fraud on account of the lot not being up to the measurement as required, or called for, and they were worried what we would do. said that we may have to pay back to Rhodes all the money we had received from him.

"Q. What else did he say about the necessity of further advances of money, and what are the facts in regard to that, Mr. Spann? A. He said I would have to put up six hundred dollars to go along with the suit, and probably more. The thing kinder staunched me a little bit, and I told Mr. Spann,—or asked Mrs. Spann what Bulger was going to do, and she told me that Bulger had not decided yet, or had not put up any money, and had not decided, he did not know. Then I told both Mr. and Mrs. Spann that I did not have the cash, or I would have to arrange to borrow it, and then Mr. Spann made the proposition to me that if I did not care to go along with them if I would return the four

notes they would pay me back the two hundred dollars,—or he told me that,—and I told him that I would consider it."

After considering the matter for some time with his wife, he concluded to accept the offer of the Spanns, take the $200 back, deliver up the Spann notes aggregating nearly $10,000 and quit. On cross-examination the complainant says this:

"Q. Did you decide to do what you did because of the statement that Mr. Rhodes had taken the bankrupt law? A. And had brought a counter-suit.

"Q. What? A. And had brought a counter-suit to set aside the judgment and it may mean that we would have to pay back the notes,—or the money we had received from him.

"Q. Did you rely upon the bankruptcy, or did you rely upon the other suit that had been filed? A. I relied upon the things, both of them, as he represented them to me.

"Q. You relied upon both of them? A. What I mean by that is the bankruptcy and the counter-suit."

Mrs. Helen M. Borchers testifies in almost exactly the same language as her husband. She says Mrs. Spann did most of the talking and that Spann said they had a survey made of the lot and it was short. She would not say how much.

Both Spann and his wife deny that they made any misrepresentation to complainant as to the situation, or did anything to induce him to make the settlement he did. They both deny saying that Rhodes had taken the bankrupt law, but they both admit that they had heard that Rhodes contemplated going into bankruptcy.

The testimony of Mrs. Spann in part is as follows:

"Q. What is your name? A. Mrs. Chas. B. Spann.

"Q. Where do you live? A. Indianapolis.

"Q. What is your business? A. Real estate.

"Q. I will ask you to state, Mrs. Spann, if, after you returned from attending the trial against Mr. Rhodes, to Indianapolis, what, if anything, was said to the Borchers with reference to conditions here, and the progress that had been made? A. Well, we called them up and after a few days or a week they came over and we told them that we would have to have some more money, that things were not looking so good.

"Q. What did they say? A. They talked it over with us.

"Q. What did you tell them? A. We told them that the trial had been postponed, that we had to make a hurried trip and that we had driven all night, that we had to obtain witnesses, that we had to have a survey, and that we had to take care of expenses on that account, and that we had to go back and fourth, that we had

to come back here, that we had to have lawyers, because they had accused us of fraud, that we had to bring witnesses, and that we had only a short time to do all of that in.

"Q. What did you tell them about the result of the trial? A. We told them that we had obtained a judgment.

"Q. Did you tell them that you had collected the money? A. No, we told them that we had the judgment, but did not see then how we were going to collect, that the attorney was not willing to pay it and that we understood that Rhodes had made the threat that it was going to cost us every cent of the judgment to collect it.

"Q. What, if anything was said in that conversation about Mr. Rhodes taking the bankrupt law? A. There was nothing said at all at that time in my presence about any bankrupt law.

"Q. Did you have any second conversation with them? A. Yes, we had two or three.

"Q. About that time? A. Two or three in a period of a month or around that.

"Q. What, if anything was said in any conversation prior to the acceptance of the settlement with reference to Rhodes taking the bankrupt law? A. We told them that there was a·possibility that he might take it.

"Q. And when was that, was it before or after the settlement? A. I think it was after, I am not sure it was after.

"Q. What is the fact as to whether or not you had received any information prior to the settlement with Borchers with reference to threats being made down here about collecting this judgment? A. I may be dumb, but I do not quite understand that question.

"Q. Read the question? Question read. A. I do not understand it yet.

"Q. Read it again. Question read.

"Q. Will you read it again?

"Q. Read the question. A. Oh, yes, I understand what you are driving at. Right after the judgment was received—I do not remember the exact words—something was said that they were going to make it so hard for us to collect the judgment that it would cost every cent that we would get out of it to collect it.

"Q. Now, after you had this first conversation with them, after you had been here trying to collect the judgment, what, if anything did you say to Mr. and Mrs. Borchers in the presence of each other with reference to the conditions and the efforts to collect that judgment? A. I told them that the lawyers had told us that Mr. Rhodes was a wealthy man, but that they

had information or had seen a letter or part of a letter that he had written that he intended that we would have to wait at least two years to collect the judgment and he was going to make us spend every cent of it before we could get it.

"Q. You told them that? A. I did."

Then after speaking of several conferences with Borchers and wife, Mrs. Spann continues:

"A. He came over and said that they had decided to drop out.. I said: 'Well, I think it is right we should return you the two hundred dollars that you paid in.'

"Q. Did you say anything about the notes? A. I said: 'We will want our notes back.'

"Q. What did he say? A. He said that he would bring them and we told him to meet us at the Meyer-Kiser Bank.

"Q. Did you pick the time and place? A. We told him that we would meet him on Monday morning at ten o'clock.

"Q. Did he appear? A. Yes.

"Q. Anybody else, with him? A. He was alone.

"Q. What happened? A. I had asked Miss Fisher at my attorney's advice to give the check in front of witnesses, to watch the transaction. I said: 'C. A., here is the check; it is not too late yet if you want to change your mind about dropping out.'"

George Knapp, attorney for Rhodes says this:

"A. Mr. Rhodes had no notice of the suit until the Marshal served him, and when he got a summons he came immediately to my office and asked me what about it, and I said, 'You will have to pay it.' He said, 'You think you can compromise it,' and I said, 'Maybe we can,' and I went to Mr. King, and at first I think I saw Mr. Earl King, but sooner or later saw both Mr. Earl and Mr. Bob King, and I tried to make a settlement with them at about sixteen thousand dollars, and finally got it up to twenty-five thousand. Mr. King, Mr. Bob King said he might entertain an offer of thirty-five thousand dollars, with seventy-five hundred dollars attorneys fee, and I said 'I will not even submit that, because the jury will not give you seventy-five hundred dollars attorneys fees, I will fight this out with you,' and that was the end of the conference. That was before the judgment was obtained. After the judgment was obtained and after the receivership bill had been filed—

"Q. (Interrupting): Let me interrupt. Was this the only offer of compromise that was made? A. Yes, sir; that was the only offer of compromise made at that time.

"Q. Wasn't there some offer made that was rejected by Mr. Spann? A. No, I never talked to Mr. Spann or Mrs. Spann.

"Q. Go ahead? Mr. Knapp. A. After the receivership suit was filed, we got Mr. King to give us a few days before taking any further action, and then I got on the train and went to Indianapolis to see Mr. Walker, and with his consent both of the Spanns, to see if a settlement could be made.

"Mr. King: That was after the rendition of the judgment?

"The Witness: After the rendition of the judgment and after a receivership bill had been filed.

"Mr. King: Uh, huh.

"The Witness: That was after an execution had been levied and a nulla bona return was made, and I thought it a good time to try to settle, and you had filed a receivership bill, and I got you to hold that up, and I went to Indianapolis to talk to Mr. Walker there, and I started trading with Mr. Walker, and I finally got up to forty-two thousand five hundred dollars, and I was under the impression we had settled it, but when I got back to Memphis on Monday I had a letter in which they said they would not settle, and I would have to take up any further negotiations with Ewing, King & King, and that was the only way we could make a settlement was through them."

After this, Rhodes settled in full by paying $22,000 in cash and putting up collateral to secure the balance.

The suit is brought to set aside the agreement by which complainant in July, 1927, agreed to deliver up the notes of Spann and accept the $200 in full settlement of his interest in the transaction, on the ground that he had been misinformed, misled and deceived by the defendants as to the prospect of collecting the judgment against Rhodes and the danger from his counter-suit. The Chancellor decreed that complainant was entitled to one-fourth of the amount recovered from Rhodes, after deducting all proper expenses and charges. After reference, report confirmed, and decree thereon, defendants Spann and wife, appeal and the complainant prosecutes a writ of error and assigns error.

The assignments of error of the appellants Spann are as follows:

"I.

"The court erred in holding and decreeing that the transaction between the Spanns and Borchers, wherein the latter withdrew and received his notes from Spann and the return of $200 he had put up for expense money, was in equity fraudulent and void, as the evidence showed there was no misrepresentation or concealment of facts or any imposition of any kind practiced on complainant, and in holding that the consideration moving from Spann to Borchers was not adequate.

## "II.

...ourt erred in holding that a trust relation existed be-...en the Spanns and Borchers. The original transaction involving the purchase of the lot in Florida had ended. The lot had been sold, the first payment thereon had been distributed among those entitled to it, and the notes of Spann given to Borchers for his part of the deferred purchase price. The transaction was, therefore, completed and ended and there was no trust relation involved in the collection of the notes.

## "III.

"The court erred in rendering a decree against the defendants for $8,320.08 for there was no evidence in the record whatever to show that they were indebted to the complainant in that or any other amount on account of the matters and things alleged in the original bill.

## "IV.

"The court erred in overruling the first exception to the Master's report, which is as follows:

"'The Master has under Item 1 of his report disallowed a commission of $300. If the defendants are to be cast in this suit they are entitled to compensation for their services and their commission in handling this trade is a legitimate and fair expense to which they are entitled. This should have been allowed.' Tr. 376."

## "V.

The court erred in not sustaining the fifth exception to the Master's report, which is as follows:

"'The Master finds that Rhodes was solvent. He had allowed a nulla bona return and a petition for a receiver to be filed against him. The Master disallows a fee to the trustee for compensation for the work and labor done and services rendered. The reference did not call upon the Master to allow or disallow a fee for the services of the Trustee but asked the Master to fix a reasonable fee under the circumstances for the services of the defendants as trustees in this cause. In view of the position taken by the Master that they were entitled to no (compensation for) services and then fixing $625 as a reasonable fee for services in case a fee should be allowed, we think the entire holding of the matter is erroneous and it is excepted to.' Tr. 377."

The first assignment contends that there was no misrepresentation or concealment of facts, no imposition of any kind and no inadequacy of consideration in the transaction attacked by complainant.

The second assignment contends that there was no trust relation existing between complainant and defendant at the time of said transaction. If defendants are accurate in the first assignment, they would not be liable in any event, but we think it too clear for serious argument that the defendants occupied a fiduciary relation to the complainant which called for the utmost good faith, and that the first assignment must be considered in the light of this relation. Defendants themselves, admit that in purchasing the lot in Miami, the complainant and defendants were associated in business as partners.

The second proposition of law in brief for appellants is this:

"The parties were associated in business as partners and in their dealing with each other were only required to make full and truthful disclosures of all material facts. For any misrepresentation or concealment liability attaches. 26 Corpus Juris, p. 1159; 12 R. C. L., p. 311, Sec. 72; 20 R. C. L., p. 878, Sec. 91."

It is not necessary to go any further than this admission of partnership to show a fiduciary relation, unless that relation had ended as appellants contend.

The relation between partners is a fiduciary one. Each is a trustee for all. 20 Ruling Case Law, p. 878, Sec. 91; Ehrmann v. Stitzel, 121 Ky., 751, 90 S. W., 275; Salhinger v. Salhinger, 56 Wash., 134, 105 Pacific, 236; Lindley on Partnership, p. 303; Parsons on Partnership, Sec. 158; Rowley on Modern Partnership, Secs. 341, 342 and 400.

A confidential relationship exists until there is an entire settlement of the partnership affairs, and clearly it existed at the time of the purchase of the Borchers' interest by the Spanns in the partnership assets. Rowley on Partnership, Sec. 351, 381; Coldsmith v. Eichold, 94 Ala., 116, 10 So., 80; Ehrmann v. Stitzel, 121 Ky., 751, 90 S. W., 275.

Counsel for appellants say the facts in the present case do not bring it within the rule announced in such cases as Coffee v. Ruffin, 4 Coldwell, 514, and Talbot v. Provine, 7 Baxter, 502, 512. We see no good reason why the principle of those cases should not apply here. In the first of these cases the court says:

"So, we think, it may now be regarded as the settled doctrine of the courts of Chancery in Tennessee, that, as a general proposition, trustees, unless they are nominally such, agents or any persons, who, by this connection with any other person, or by being employed or concerned in his affairs, have acquired a knowledge of his property, are incapable themselves of purchasing the trust property, or the property over which they may have control as trustees or agents, or in right of any fiduciary

or confidential relations whatever, from the cestui que trusts, or beneficiary, or principal. But if the party seeking to maintain such transaction can show by clear and satisfactory proof that the same was, in all respects, fair and entirely free from all imputation of fraud or unfair advantage; that there was no concealment and no advantage taken by the trustee, or such person standing in such fiduciary or confidential relation, of information or knowledge acquired by him as such, and that there was no inadequacy of consideration, a court of equity will not interpose to set it aside. The fact that the relation may have terminated before the date of the transaction cannot affect or change the rule, but it is a fact to be taken into consideration in the investigation of the question touching the alleged fairness of the transaction, and may be entitled to much or little weight, depending upon the particular circumstances of the case.''

Certainly by virtue of their fiduciary relation to complainant the defendants acquired a knowledge of his affairs so far as his interest in this property was concerned and the burden would be upon the defendants to show that the settlement was in all respects fair and the consideration adequate. Perhaps, however, upon this record the question of the burden of proof is not very material.

The Chancellor held that Spann and wife did not say to complainant that Rhodes had gone into bankruptcy. It may be they did not, but we think they created the impression on the mind of complainant that Rhodes had either become bankrupt, or was likely to. They admit that Rhodes or his attorney had made threats of bankruptcy and they were not leaving out anything which would make an impression on complainant as to the uncertainty of collecting the judgment. The testimony of Mrs. Spann is especially significant. She explains to complainant and his wife what an awful hard time she and Spann had already had just to obtain the judgment and then she says ''We told them we had the judgment but did not see then how we were going to collect; that the attorney was not willing to pay it and that we understood that Rhodes had made the threat that it was going to cost us every cent of the judgment to collect it.'' It is not shown that Rhodes had made any such threat but it is shown that Knapp had offered to pay $25,000 to settle the suit before judgment, and the defendant's counsel refused to consider less than $35,000 with a large attorney's fee in addition. This was not disclosed to complainant. Both he and his wife swear positively to this effect and neither of the Spanns testify to the contrary. This attitude of defendants toward the offer of compromise does not look like they were even doubtful about collecting the judgment, yet they did not give complainant the benefit of this offer of settlement to stimulate his confidence.

Again, Mrs. Spann says: "We told them there was a possibility that he might take it." (That is the bankrupt law.) "Q. And when was that, was it before or after the settlement? A. I think it was after. I am not sure it was after."

The court is even less sure than the witness that it was after. It is not shown that the Spanns and complainant had any conference after the settlement, and why should Mrs. Spann have tried after the settlement to create the impression in complainant's mind that Rhodes might go into bankruptcy. It was not long after the settlement until Rhodes offered $35,000, then $42,000 and then settled in full, and yet, the defendants tried to impress upon complainant at least, the danger of Rhodes going into bankruptcy, when evidently they and their attorneys by rejecting offers of compromise showed that they did not believe there was any such danger.

Complainant and his wife both say the statement was made by the Spanns that Rhodes had brought a counter-suit and if he succeeded in this, that they might have to pay back all that Rhodes had paid, and complainant says this had great weight with him. They did not tell him that this defense had been made in the Federal Court in Memphis and decided against Rhodes when the judgment was rendered. They did not tell complainant that the survey showed there was no shortage in the lot. It is true the judgment might have been subject to appeal when the conferences in regard to the settlement were going on, still it is true beyond controversy that defendants had reasons for their confidence in their ability to collect the judgment which they did not disclose to complainant.

There is still another thing in the testimony of Mrs. Spann which impresses us. When the settlement was to be closed, they notified complainant to meet them at the bank. He came alone, but she, upon advice of counsel, had asked Miss Fisher to give the check for $200 "in front of witnesses," and she said "C. A. here is the check; it is not too late yet if you want to change your mind about dropping out." She protests too much. She wants witnesses that she informed complainant that he was still a free agent. That he could do as he pleased. It reminds us of the meticulous way in which persons sometimes plant the evidence with which to establish an alibi. Complainant went alone. He says he had confidence in Spann. That he did not care to consult any one else. He knew nothing about the real estate business, especially in Florida. He left it all to defendants. He sent his $1300 in answer to a telegram. Spann sold without consulting him; the Spanns managed the lawsuit. They were on the ground in Memphis and complainant was not, and they did not take complainant into their confidence; they did not tell him all they knew about Rhodes and his ability to pay. The fiduciary relation

had not ended and they did not treat complainant as that relation demanded they should.

The third assignment is answered in what has been said in regard to the first and second. The fourth assignment claims a commission of $300 if defendants are not to be allowed the enormous profit they expected from their settlement with complainant. They were not claiming a commission before the settlement. They have put the complainant to great expense. They should not be allowed a commission simply because they are compelled by the court to do what they ought to have done voluntarily. The same reasoning applies to the fifth assignment. If complainant had not been persuaded to quit, the defendants might have asked for some compensation for the trouble, the unexpected trouble, of the litigation against Rhodes, but not having lived up to the obligations imposed on them by their fiduciary relation, and having caused complainant the expense of the present litigation, their claim should not be allowed. All assignments of error of appellants are overruled.

The complainant has prosecuted a writ of error and assigns as error that the decree allows as expenses to the defendants, expenditures in the case of The Central Leases, Inc. v. Spann, amounting to $1792, of which one-fourth was charged to complainant.

It appears from the record that Charles B. Spann had executed certain notes for the purchase of property in Florida and that these notes had been acquired by a corporation known as The Central Leases, Inc. Said Central Leases, Inc. had impounded the funds, a portion of which is not involved in this litigation,. and had brought suit in the Chancery Court of Shelby County, Tennessee, against Charles B. Spann and Mary R. Spann. The said Central Leases, Inc. was made a party to this litigation because they were claiming these funds, and complainant brought them into this suit for the purpose of establishing his superior right to one-fourth of the judgment.

The decree holds that The Central Leases, Inc. had no claim against complainant's interest in said fund, and there is no appeal from this, but contrary to the Master's report, the court allowed defendants credit for expenses, attorneys' fees, etc. in the litigation with said company. We think the Master's report gives good reasons for not allowing these expenses. It is as follows:

"Items 16, 18, 19, 30 and 31 are disallowed because they refer to expenses incurred in defending the suit of "Central Leases, Inc. v. Spann" (which was a suit by said complainant, Central Leases, Inc., claiming to be a creditor of the Spanns, and making no claim whatever of indebtedness against complainants herein, the Borchers), in, and by, which suit, Central Leases, Inc. sought to subject the avails of the judgment against Rhodes

(in which judgment complainants, the Borchers, were interested) to the payment of its claim against the Spanns—and the Master is of the opinion, and so finds and reports, that, as complainants in the instant case were in no way responsible or liable for the alleged claim of Central Leases, Inc., that they were, and are, in no way chargeable with any expenses incurred by the Spanns in resisting the effort of their individual creditors to subject to its said claim any portion of the avails of said judgment against Rhodes, and, furthermore, the Master is of the opinion, and so finds and reports, that, if, promptly upon the rendition of the judgment against Rhodes, defendants had made proper report thereof to, and proper settlement thereof with, complainants, that complainants' interest in said judgment against Rhodes could not have been in any way involved in, or jeopardized by, this effort of Central Leases, Inc., to reach a portion of the avails of said judgment against Rhodes and, again, if Central Leases, Inc. had sought to reach only the interest of the Spanns in this judgment against Rhodes, they, the Spanns, would have necessarily incurred the same expense in any effort they might have made to defeat such proceeding by Central Leases, Inc., and, lastly, the order of reference does not direct the Master to report as to any expenses incurred by defendants in connection with any litigation in which Central Leases, Inc., is a party.''

We think the Master was right that the reference did not include the expense in the suit by The Central Leases, Inc. v. Spann, and besides, it was a suit against Spann alone and while it sought to impound the fund derived from Rhodes in order to subject it to Spann's individual debt, yet Spann, if he had preserved his fiduciary status could easily have protected complainant's interests at little if any, expense, by showing that he held one-fourth of the fund as trustee.

The assignments of error of complainant are sustained and the decree modified accordingly. All the assignments of the defendants are overruled and except as modified, the decree is affirmed. Appellants will pay the cost of the appeal. The cause will be remanded for the purpose of carrying out the decree.

Senter and Owen, JJ., concur.